No. 32,616

THE ASSOCIATED DAIRIES OF WICHITA, *Appellee*, v. BOB FLETCHER et al., *Appellants*.

(56 P. 2d 106)

Opinion filed April 11, 1936.

*Harold H. Malone, Earl Blake, Clifford Branch* and *Clyde Souders*, all of Wichita, for the appellants.

*William J. Wertz, Vincent F. Hiebsch* and *Forest V. McCalley*, all of Wichita, for the appellee.

The opinion of the court was delivered by

BURCH, C. J.: The action was one to enjoin unauthorized use of trade-marked milk bottles. Plaintiff prevailed, and defendants appeal.

The milk industry in the city of Wichita is conducted by three groups: Those who pasteurize and distribute milk, an association of natural-milk producers and distributors, called the Wichita Natural Milk Producers Association, and a group which may be called independent producers and distributors.

Each member of the pasteurizing group registered a trade-mark blown in the bottle for his own use, and the natural milk producers' association registered a trade-mark blown in the bottle for use by its members. This was done pursuant to the trade-mark law of this state, R. S. 81-101 and following sections, and it may be noted here, use of trade-marked bottles increased the business of the pasteurizers and natural-milk producers five percent.

The first section of the trade-mark law, R. S. 81-101, provides that the owner of any kind of container or receptacle, including bottles, may register his name, brand, design, trade-mark, device or other mark of ownership, stamped, impressed, or affixed as a label, on the container, or blown in the bottle, with the secretary of state.

The material portion of R. S. 81-102 reads:

"It shall be unlawful for any 'person or persons or corporation, or any of the agents of such person or persons or corporation, without the written consent of the owner thereof, to willfully use or fill with any similar substance as the same originally contained any of the receptacles enumerated in section 1 of this act, bearing a trade-mark so registered as aforesaid, with intent to sell, barter or exchange the same as genuine, or to change, shift, intermix, dilute or adulterate the original contents of any such receptacle, with intent to sell, barter, exchange the same as if it were genuine and original. . . ."

R. S. 81-103 provides a penalty for violation of the trade-mark law. R. S. 81-104 provides for action for injunction against using, handling, or trafficking in trade-marked containers by persons other than the owner, and for action for damages resulting from prohibited uses.

R. S. 1933 Supp. 65-706, which is a part of the statute concerning production and distribution of milk, cream, and dairy products, makes it unlawful for any person other than the rightful owner to use any milk can, milk bottle, or other receptacle, marked with the brand or trade-mark of the owner, except with written consent of the owner.

Assume that there is but one milkman for a city. He makes a delivery of milk to customers, large and small, this morning. He does not merely deliver a quantity of milk at a price per pint or quart. He delivers the milk in a bottle which costs some money. The bottle belongs to him. Tomorrow morning he will deliver milk again, and will pick up empty bottles, which he expects to receive and which the customer expected to return. He may not, however, get back all the bottles left this morning. Bottles accumulate in homes and numerous other places where milk is used. Some are lost, some stray, some are stolen, and some are broken. It requires seven or eight bottles for one to saturate the milk trade. Therefore, in order to insure against loss of bottles, the customer makes a deposit for the number of bottles he uses. When a bottle is returned, the deposit is returned in money or credit.

Assume there are two milkmen for a city. Each one does business with his customers in the manner described. A grocer takes milk from both, and does business with his customers as if he were a milkman. The milkmen use standard bottles. Each one picks up bottles of the other, and identity of the owner of a particular bottle is not traceable. Neither milkman nor grocer considers he is in the business, first on one side of the transaction and then on the

other, of making daily sales and purchases of milk bottles, and they are not so engaged. They are dealing with an incident of conduct of the milk business, and the same is true of the relation of the grocer to his customers. In sporadic cases, milk and bottle are sold for a lump price.

When several kinds of trade-marked bottles came into use, special arrangements became necessary to facilitate the handling of the milk trade, and it may be said here the pasteurizers and the members of the natural milk association, using marked bottles, deliver ninety-four percent of the milk sold in Wichita. The owner of one kind of trade-marked bottle could not, and of course would not, use the trade-marked bottle of another owner. When a delivery of milk was made, bottles were picked up indifferently and a bottle exchange was established, a sort of bottle clearing-house, where each owner could receive his own trade-marked bottles in exchange for other trade-marked bottles. The exchange was paid one half cent per bottle for the service.

Trouble arose when the independents, using plain bottles only, or bottles bearing an unregistered mark, picked up trade-marked bottles and used them in delivering their own milk. One defendant sold 100 bottles of milk daily. She owned only 175 to 200 bottles, and could not, normally, with her own stock of bottles, supply her customers two days in succession. Another defendant was a large dealer who lacked several thousand bottles of having enough to supply his trade. The result was, independents conducted their business by a method described by the court in the case of *People v. Ryan*, 243 N. Y. S. 644, 230 App. Div. 252, as bootlegging milk bottles to save the expense of purchasing an adequate supply of their own. Beside that, every time one delivered his own raw milk in a pasteurizer's trade-marked bottle, he was plainly guilty of deception; and every time he delivered his own milk in any trade-marked bottle he violated a property right of the owner of the bottle.

When use of trade-marked bottles was adopted by the owners they notified the trade generally, by advertisement, and notified milk dealers by letter, that title to trade-marked bottles would no longer be in the possessor, but would remain in the owner. This was an innovation, disturbing to an old custom, something which it is always difficult to make prevail. It was difficult to educate people to understand that a marked bottle belonged to the owner, whoever had possession of it. Independent milk dealers resisted the new

plan, and it was necessary to proceed in a practical way, in order to effectuate the change.

When use of trade-marked bottles was inaugurated, the exchange operated for a time without charge. All kinds of bottles were accepted indiscriminately. A large number of plain bottles accumulated, which were sold to a dealer in Wichita, who conducts a wholesale bottle business throughout a large territory. He disposed of the plain bottles by filling orders from outside the city in the usual course of business. The proof was, this was not done to create any plain-bottle shortage in the city, as some independents charged. After the first week, few plain bottles came in, the number at the time of trial being about a gross per week. The total delivery in Wichita is about 26,000 bottles of milk daily.

Some plain bottles do come into the exchange, brought there by owners and users of trade-marked bottles who pick them up. A pasteurizer leaves at a grocery store a case of twelve marked bottles of milk. He picks up twelve of his own bottles if he can. If there are not twelve of his own bottles available he picks up other trade-marked bottles. If there are not twelve marked bottles available he will fill out the number with plain bottles. The testimony was, he is obliged to do this or lose a customer, but he does not do this to relinquish title and permit his bottles to be commingled with the common property of the community. On some occasions when there was a temporary bottle shortage, owners and users of marked bottles have delivered milk in plain bottles they had picked up, but this was not typical of their conduct of the milk business.

These departures from normal practice are magnified by defendants, who contend the owners and users of marked bottles are doing just as they previously did, a bottle is still just a bottle, and the owners of the marked bottles parted with title to the possessors. One fact which alone refuted this contention was that the deposit to secure the return of marked bottles was fixed at three cents per bottle. The bottles cost, at wholesale, more than six cents apiece, and it is idle to contend they are being sold daily for less than half price.

The question of fact, whether in the face of difficulties in working under an untried law, plaintiff forfeited benefit of the law, is the turning point in the case. No special findings were requested or were made. The court found generally in favor of plaintiff. The general finding was contrary to the contention of defendants. As

this court remarked once before, it does not retry cases on the facts. It looks for evidence to sustain the findings of the district court, and in this instance the general finding was abundantly justified.

With the wisdom of permitting owners to trade-mark their milk bottles the courts have nothing to do. The purpose of the statutes which have been referred to is four-fold: To protect the public health in respect to a necessary article of food in universal use; to prevent deception in the sale of milk; to secure to the owner his property interest in his containers, and to secure to the owner all benefits which may accrue to him from publicity of his brand of milk. The statutes are valid as enactments pursuant to the police power of the state. The independent milkmen and dealers in milk are charged with knowledge of the law. The brand on the bottle is prima facie evidence of ownership. The burden rests on a user other than the owner to show written consent of the owner to the use. Without that consent the use is forbidden. That the statute cuts across old habits and customs, and makes radical change in conduct of the business of supplying milk to a community, is not important. That some consequent advantages are enjoyed and some consequent disadvantages are suffered are natural results of operation of the law. The laws were enacted in the interest of the general welfare, and small minorities, whose interests were presumably considered when the laws were framed, must respect them and conform to them. If, when balanced against general good, too great individual harm results, the remedy is by appeal to the legislature.

Defendants contend that injunction to prevent unauthorized use of marked bottles will create a monopoly of the milk business, to destruction of defendant's business. There are several answers. One is, the contention is not sound. Another is, if defendants cannot do business in competition with business conducted with marked bottles they suffer no injury in a legal sense. The trade-mark law was enacted ten years after the law in restraint of trade was enacted, and the all-important dairy products law, which is purely a public health law, containing the provision forbidding use of trade-marked bottles without consent of the owner, was enacted thirty years after the law in restraint of trade was enacted.

Defendants' chief witness testified he had tried to exchange marked bottles for plain bottles at the exchange, had been refused, and he had not tried again, believing it would be of no use. The same witness said, "They haven't got enough plain bottles to ex-

change." The manager of the exchange testified they did not have plain bottles at the exchange to exchange for marked bottles.

Some cases are cited. It is not necessary to review them. None of them involves closely related statutes, nor closely related facts. One case cited by plaintiff is quite similar to this one, and injunction was granted. (*Denver Exchange v. McKinzie,* 87 Colo. 379, 287 Pac. 868.) No public-health statute intervening to prevent unauthorized use of trade-marked bottles was involved. The decision does make it unnecessary to discuss a contention made here that plaintiff lacked capacity to sue.

The judgment of the district court is affirmed.